**Deepa SONI, M.D., Plaintiff,**

v.

**BOSTON MEDICAL CENTER CORP., et al., Defendants.**

**Civil Action No. 08–12028–JGD.**

United States District Court,
D. Massachusetts.

Oct. 9, 2009.

---

Elise A. Brassil, Law Offices of Elise A. Brassil, Andover, MA, Kenneth Joel Haber, Douglas G. Wadler, Law Office of Kenneth Joel Haber, PC, Rockville, MD, for Plaintiffs.

Itia R.S. Roth, Amy E. Serino, Prince, Lobel, Glovsky & Tye LLP, Boston, MA, for Defendants.

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Deepa Soni, M.D. ("Dr. Soni"), a former neurosurgeon at Boston Medical Center ("BMC") and a former Assistant Professor of Medicine at Boston University School of Medicine, has brought this action against Boston Medical Center Corporation ("BMC Corp."), Boston University Neurosurgical Associates, Inc. ("BUNA"), Boston University d/b/a Boston University School of Medicine ("BUSM"), Larry Chin, M.D. ("Dr. Chin") and Arthur Day, M.D. ("Dr. Day"), claiming that she was wrongfully terminated from her employment in retaliation for complaints that she made about unlawful billing practices and regulatory violations at BMC, and claims that she brought against Dr. Day for discrimination on the basis of gender, race and national origin. By her Complaint (Docket No. 1), Dr. Soni has asserted claims against each of the defendants for unlawful retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), (Claim I), discrimination and retaliation pursuant to 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq., (Claims II–V), conspiracy (Claim VI), and intentional infliction of emotional distress (Claim VII).

The present action is one of three pending lawsuits in which Dr. Soni has asserted similar claims against one or more of the defendants. In a separate lawsuit filed in this court (C.A. No. 08–11875), Dr. Soni has brought claims against Dr. Day for alleged acts of discrimination and retaliation that occurred while Dr. Soni was in a residency program at Brigham & Women's Hospital. Additionally, after BMC Corp., BUNA and Dr. Chin filed a state court action seeking damages for breach of contract against Dr. Soni and a declaratory judgment that the termination of Dr. Soni's employment was appropriate and that she is not entitled to reinstatement, Dr. Soni brought counterclaims in which she has alleged, inter alia, that BMC Corp., BUNA and Dr. Chin discriminated against her on the basis of her gender, and that they wrongfully terminated her em-

ployment in retaliation for her claims of discrimination against Dr. Day and her complaints about problems at BMC. Thus, as in the present case, the state court matter concerns the circumstances surrounding the termination of Dr. Soni's employment as a neurosurgeon at BMC.

Presently before the court is the "Defendants' Consolidated Motion to Dismiss or, in the Alternative, to Strike." (Docket No. 22). By their motion, the defendants are seeking a ruling that abstention is appropriate, pursuant to the Supreme Court's decision in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("*Colorado River*"), and that this matter should be dismissed in favor of the pending state court proceedings. Alternatively, the defendants contend that all of the claims should be dismissed for failure to comply with Fed.R.Civ.P. 8(a); dismissal of the claims against BMC Corp., BUNA and Dr. Chin is warranted because those claims should have been raised as compulsory counterclaims in the state court case; Dr. Soni has failed to state a claim against any of the defendants for violations of the FCA or civil conspiracy, or against Drs. Day and Chin under Title VII; and Dr. Soni's claims against BMC Corp., BUNA, BUSM and Dr. Chin for intentional infliction of emotional distress are barred by the exclusivity provision of the Massachusetts Workers' Compensation Act.

For all of the reasons detailed herein, the defendants' motion is ALLOWED IN PART and DENIED IN PART. This court finds that this case does not present exceptional circumstances that would support abstention under *Colorado River*. Nor does this court find that the plaintiff's complaint constitutes a gross violation of Fed.R.Civ.P. 8(a) that would warrant dismissal of all her claims under that Rule. However, for the reasons set forth below, the motion is allowed as to (1) all claims

against Dr. Chin, BMC Corp. and BUNA; (2) Dr. Soni's claims against Dr. Day under the FCA and Title VII; (3) the claim for conspiracy; and (4) Dr. Soni's claim against all defendants except Dr. Day for intentional infliction of emotional distress. The motion is otherwise denied. Within thirty (30) days following the date of this Memorandum of Decision and Order, Dr. Soni shall file an amended complaint that sets forth her surviving claims against BUSM and Dr. Day, and contains only those factual allegations that are directly relevant to those claims.

## II. *STATEMENT OF FACTS*

■ When ruling on a motion to dismiss, the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir.1999). "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993)). Applying this standard to the instant case, the relevant facts are as follows.

### *The Parties*

Dr. Soni is a United States citizen of Indian descent and is licensed to practice medicine in the Commonwealth of Massachusetts. (Compl. (Docket No. 1) ¶ 10). Following her graduation from medical school, Dr. Soni completed a 7–year neuro-

surgery residency training program at Brigham & Women's Hospital ("Brigham & Women's"), Harvard Medical School and Children's Hospital in Boston. (*Id.* ¶ 34). Both Brigham & Women's and Children's Hospital are Harvard affiliated teaching hospitals, and are among the top-rated institutions in the world. (*Id.*). Dr. Soni was the second woman ever to complete the entire neurosurgery residency program at Brigham & Women's in the program's more than 70 year history. (*Id.* ¶ 35).

Dr. Day is a medical doctor who serves as Chairman of the Neurosurgery Department for Brigham & Women's and Harvard Medical School, and as the Director of the neurosurgery residency program at Brigham & Women's and Children's Hospital. (*Id.* ¶ 22). He also serves as co-chairman of the ACGME Neurosurgery Residency Review Committee, a national organization that accredits new and existing neurosurgery residency training programs. (*Id.* ¶ 61). According to the plaintiff, Dr. Day is an extremely powerful person within the field of neurosurgery. (*Id.*).

Dr. Day supervised Dr. Soni during her residency training at Brigham & Women's. (*Id.* ¶ 22). The plaintiff claims that at that time, Dr. Day displayed inappropriate, unprofessional and sexist behavior towards her, and discriminated against her on the basis of her gender, race and national origin. (*See id.* ¶¶ 67–72, 75–78). In a separate lawsuit filed with this court, Dr. Soni has asserted claims against Dr. Day and Brigham & Women's for alleged discrimination and retaliation that she suffered while she was a resident. (*Id.* ¶ 78).

Following her residency, which ended on June 30, 2006, Dr. Soni completed an additional year of specialized fellowship training in cerebrovascular neurosurgery. (*Id.* ¶ 36). Thereafter, in July 2007, Dr. Soni became employed by BUNA. (*Id.* ¶ 37).

Dr. Soni's claims in this action are based on events that occurred after she began working for BUNA. (*Id.* ¶ 19).

BUNA is a non-profit, faculty practice corporation that is organized and operated for the benefit of the Department of Neurosurgery at BMC and has an academic affiliation with BUSM. (*See id.* ¶¶ 13, 37–38). As part of her employment at BUNA, Dr. Soni had appointments as an Assistant Professor at BUSM and as a staff neurosurgeon at BMC, the hospital owned and operated by BMC Corp. (*Id.* ¶¶ 12, 39). Dr. Soni was the first female and the first person of Indian heritage to become employed as a neurosurgeon by BUNA and BMC Corp. or to become employed as a member of the neurosurgery faculty at BUSM. (*Id.* ¶ 40).

Dr. Soni's immediate supervisor during the period of her employment at BUNA and BMC was Dr. Chin. (*Id.* ¶ 41). Dr. Chin is the President and Chief Executive Officer of BUNA. (*Id.* ¶ 200). He is also a medical doctor who serves as the Chairman of the Neurosurgery Departments at BMC and BUSM. (*Id.* ¶ 20).

Although Dr. Chin did not work at the same hospital as Dr. Day, Dr. Soni alleges that Dr. Chin needed to please Dr. Day in order to advance his own professional career. According to Dr. Soni, Dr. Chin had been hired by BMC Corp. with the hope and expectation that he would be able to establish a neurosurgery residency training program at BMC. (*Id.* ¶ 107). Allegedly, Dr. Chin could not establish such a program without the approval of the ACGME Neurosurgery Residency Review Committee that is co-chaired by Dr. Day. (*Id.* ¶ 84). Furthermore, in order to fulfill the training requirements of such a program, Dr. Chin needed future residents to complete a rotation in pediatric neurosurgery at Children's Hospital. (*Id.* ¶ 85). Dr. Soni alleges that Dr. Day had sole

authority for approving any such rotations. (*Id.*).

Dr. Soni claims that as a result of a blemished start as Chairman of the Neurosurgery Department at BMC, Dr. Chin sought to not "make waves" with the hospital management. (*Id.* ¶ 115). Specifically, she alleges that in or about May 2006, when Dr. Chin began his work as Chairman, he engaged in an improper relationship with a neurosurgery fellow. (*Id.* ¶ 112). After the relationship ended, Dr. Chin allegedly attempted to recover his reputation by focusing on the establishment of a neurosurgery residency program, maximizing revenues for BMC and distinguishing himself as the top billing physician in the hospital's Neurosurgery Department. (*Id.* ¶¶ 116–18). Dr. Soni alleges that under Dr. Chin's leadership, concerns over quality assurance and patient care were ignored or downplayed while importance was placed on generating revenues. (*Id.* ¶ 119).

### Dr. Soni's Employment at BMC

Dr. Soni began to perform surgeries at BMC in August 2007. (*Id.* ¶ 136). She complains that in connection with this work, she was given little or no clinical support, and often had to perform long and complex procedures without the assistance of another neurosurgeon or a neurosurgery fellow. (*Id.*). In contrast, Dr. Chin was always assisted by another neurosurgeon or neurosurgery fellow during surgeries. (*Id.* ¶ 147). Dr. Soni claims that the defendants discriminated against her by failing to provide her with the same clinical support that was given to non-Indian males. (*See id.* ¶ 183).

According to the plaintiff, the lack of adequate clinical support could lead to medical complications and lengthier operations, which in turn could lead to longer hospital stays and higher billings, including billings submitted to federal Medicare and Medicaid programs. (*Id.* ¶ 149).

Consequently, Dr. Soni began to investigate whether BMC was in violation of federal regulations concerning conditions for participation in the Medicare and Medicaid programs. (*See id.* ¶¶ 102, 150–55). She also complained to Dr. Chin and others at BMC, but the defendants allegedly did nothing to assist her. (*See id.* ¶¶ 146–52, 182–83).

Dr. Soni also claims that during her employment at BMC, she was required to work about twice as many on-call hours as white, male neurosurgeons, but was not provided with the same administrative assistance that her white male colleagues received. (*Id.* ¶¶ 140, 182–83, 246–47). She contends that the defendants' failure to provide her with the same administrative support given to non-Indian males was discriminatory. (*See id.* ¶ 183). She further contends that as a result of this treatment, she was unable to complete her medical records in a professional and timely fashion. (*Id.* ¶¶ 140, 182, 246).

Dr. Soni claims that in addition to the allegedly unequal treatment she experienced at BMC, she suffered unfair and unwarranted criticism from Dr. Chin after he learned that she had filed a complaint against Dr. Day for unlawful discrimination. Specifically, she alleges that although Dr. Chin conducted no regular evaluations of the work performed by any of the hospital's neurosurgeons, before she gave him notice of her complaint against Dr. Day, Dr. Chin had not indicated that there were any problems with respect to the medical services that Dr. Soni was providing at BMC and had advised her that she was meeting all of her job requirements and that there were no issues to discuss. (*See id.* ¶ 126, 129, 130). However, in December 2007, Dr. Soni informed Dr. Chin that she had filed a complaint against Dr. Day with the Massachusetts Commission Against Discrimination

("MCAD"). (*Id.* ¶ 86). Dr. Soni felt compelled to provide this information to Dr. Chin because stories about complaints against Dr. Day were appearing in the press. (*Id.*). Dr. Chin allegedly responded by asking Dr. Soni how her MCAD complaint would affect his ability to create a neurosurgery residency program at BMC. (*Id.* ¶ 87). Moreover, Dr. Soni alleges that Dr. Chin began to criticize her medical work at the hospital shortly after learning about her MCAD complaint. (*Id.* ¶¶ 88, 131).

In January 2008, Dr. Soni began to bring numerous complaints regarding patient care, quality control and billing issues to the attention of Dr. Chin and other staff members at BMC. (*Id.* ¶¶ 132–35, 141–42, 206). In particular, Dr. Soni complained that BMC lacked the infrastructure and post-operative care necessary to handle the complex neurosurgery procedures that she had been hired to perform. (*Id.* ¶ 153). She also complained that BMC lacked adequate equipment and facilities necessary for the safe and appropriate treatment of neurosurgery patients, that the hospital issued bills for extended hospital stays arising from preventable complications and delays in performing surgery, that BMC failed to take adequate steps to address the numerous and repeated infections afflicting neurosurgery patients, and that the Department of Neurosurgery engaged in billing for unnecessary and/or excessive medical treatments and procedures. (*Id.* ¶¶ 157–59, 163–65, 169, 173, 175). Dr. Soni alleges that her reports about patient safety issues angered Dr. Chin. (*Id.* ¶ 94). She also asserts that Dr. Chin frustrated her efforts to express her concerns to the hospital's top level management. (*See id.* ¶ 211).

Among the issues that Dr. Soni allegedly identified at the hospital were improper billing practices. (*See, e.g., id.* ¶¶ 173, 206). Dr. Soni alleges that in his efforts to

maximize revenues for the Neurosurgery Department, Dr. Chin was submitting fraudulent claims to third-party payors. (*Id.* ¶ 144). Dr. Soni contends that she is prepared to reveal the specific facts regarding her allegations of fraudulent billing, but only upon authorization of the court. (*See id.* ¶¶ 145, 174, 191). Nevertheless, the plaintiff does allege that Dr. Chin performed medically unnecessary and unnecessarily costly surgeries in order to maximize his own income and Neurosurgery Department revenues. (*Id.* ¶ 187). She also alleges that Dr. Chin required neurosurgeons to perform routine surgical procedures instead of other hospital personnel in order to bill third-party payers at higher rates. (*Id.* ¶¶ 189–90). According to the plaintiff, a large percentage of the patients treated at BMC were covered by Medicare, Medicaid or other federal health care programs. (*Id.* ¶ 134).

Dr. Soni investigated whether BMC was violating federal regulations pertaining to conditions of participation in the Medicare program as a result of the alleged deficiencies and billing issues that she discovered at the hospital. (*See id.* ¶¶ 154–55, 160–61, 170–71, 193–94). She contends that she is prepared to disclose specific facts, and the identity of those whom she notified about the results of her investigations, but again only upon authorization of the court. (*See id.* ¶¶ 156, 162, 168, 172, 195).

### Termination of Soni's Employment

Dr. Soni claims that Dr. Day sought to retaliate against her for filing discrimination claims against him and for supporting other female neurosurgeons in connection with their own complaints of discrimination against him. (*Id.* ¶¶ 220, 228–29). She also claims Dr. Day conspired with Dr. Chin to terminate her employment with BUNA, BUSM and BMC. (*See id.* ¶¶ 331–41).

Specifically, Dr. Soni alleges that in late February 2008, Dr. Soni attended a national neurosurgery meeting in New Orleans. (*Id.* ¶ 225). At the meeting, she was openly mocked by male neurosurgeons who were friendly with Dr. Day. (*Id.*). Additionally, during a social event that was sponsored in connection with the New Orleans meeting, Dr. Soni encountered Dr. Day for the first time since she graduated from the neurosurgery residency program at Brigham & Women's. (*Id.* ¶ 226). Subsequently, on March 3, 2008, within one week of her return to BMC from the New Orleans meeting, Dr. Chin notified Dr. Soni that BMC intended to terminate her employment at the hospital. (*Id.* ¶ 233). Dr. Soni claims that Dr. Chin communicated with Dr. Day and/or with other members of the neurosurgery community immediately prior to notifying Dr. Soni of her termination. (*Id.* ¶ 230).

Initially, Dr. Chin told Dr. Soni that her employment termination was the result of her failure to timely complete medical records and medical billing forms. (*Id.* ¶ 234). However, he later advised Dr. Soni that she was being terminated because her employment at BMC simply was not working out. (*Id.* ¶ 235).

On March 3, 2008, Dr. Soni wrote a formal grievance letter to Karen Antman, M.D., the Dean of BUSM, in which she described how she had been subjected to hostility and retaliation by Dr. Chin. (*Id.* ¶ 236–37). Dr. Soni alleges that Dr. Antman did not respond substantively to her grievance, opting instead to let BMC management and its attorneys handle the dispute. (*Id.* ¶ 238).

On March 18, 2008, Dr. Chin sent a letter to Dr. Soni in which he formally advised her that she would be terminated from her employment, effective sixty days from the date of the letter. (*Id.* ¶ 239). Since that time, BMC has maintained that the basis for its action was Dr. Soni's failure to timely complete medical records and billing forms. (*Id.* ¶ 243). For her part, Dr. Soni claims that BMC's stated reason is merely a pretext intended to disguise the real reasons for her termination. (*See id.* ¶¶ 244–45). According to Dr. Soni, the Massachusetts Medical Board prohibits disciplinary actions against physicians for failing to comply with administrative tasks such as the timely completion of medical records, and BMC medical staff by-laws provide for, at most, administrative suspension for failing to complete timely recordkeeping. (*Id.* ¶¶ 250–51). Moreover, prior to March 3, 2008, neither Dr. Chin nor anyone else at BMC informed Dr. Soni that her employment was in jeopardy or that her failure to complete her medical records and billing forms on time could lead to her termination. (*Id.* ¶ 253).

Dr. Soni alleges that the real reason she was terminated was because she had raised issues about quality assurance, billing and compliance with the Medicare program. (*Id.* ¶ 244). She further alleges that she was terminated, in conjunction with an agreement between Dr. Chin and Dr. Day, for filing discrimination claims against Dr. Day and for supporting other minority physicians in connection with their complaints against Dr. Day. (*See id.* ¶ 245).

After BMC terminated Dr. Soni's employment, BUNA and BUSM allegedly denied her teaching responsibilities and surgical cases to work on. (*Id.* ¶ 255). Therefore, according to Dr. Soni, those defendants effectively terminated her employment as well. (*Id.*). Moreover, after she was fired, the defendants allegedly impeded Dr. Soni's ability to find work by failing to provide true and accurate credentialing documentation to potential employers. (*Id.* ¶ 256). Nevertheless, Dr. Soni ultimately was able to secure a new

position as a neurosurgeon at another Massachusetts hospital. (*See* Pl. Mem. (Docket No. 25) at 19).

Within one month of advising Dr. Soni that she would be terminated, Dr. Chin allegedly submitted a formal application to the ACGME Residency Review Committee requesting approval for the establishment of a neurosurgery residency program at BMC. (*Id.* ¶ 242). There are no allegations regarding the outcome of the application.

### State Court Proceedings

On May 7, 2008, BMC Corp., BUNA and Dr. Chin (the "BMC Defendants") filed an action for declaratory relief against Dr. Soni in Suffolk Superior Court (the "State Court Action"). (*See* Def. Ex. A).[1] In their original complaint, the BMC Defendants alleged that they were authorized to terminate Dr. Soni's employment, pursuant to a Physician Practice Agreement that Dr. Soni had entered into with BUNA, for failing to comply with recordkeeping and billing obligations. (*See id.*). Additionally, the BMC Defendants asserted a claim for a declaratory judgment that Dr. Soni would not be entitled to the continuation of her employment after May 23, 2008. (*Id.* ¶¶ 35–37).

The BMC Defendants have since filed an amended complaint in the State Court Action. (*See* Def. Ex. E). Therein, the BMC Defendants have asserted a claim for a declaratory judgment that Dr. Soni is not entitled to the continuation or reinstatement of her employment, as well as claims for breach of the Physician Practice Agreement arising from Dr. Soni's alleged failure to comply with her recordkeeping and billing obligations. (*See* Def. Ex. E).

Immediately following the BMC Defendants' filing of their State Court Action, Dr. Soni filed a separate complaint against the BMC Defendants in Suffolk Superior Court in which she asserted claims for discrimination pursuant to Mass. Gen. Laws ch. 151B, defamation, intentional interference with contractual relations, and wrongful termination pursuant to the Massachusetts Whistleblower Protection Act. (Def. Ex. B). She also filed a motion for a temporary restraining order to prevent the BMC Defendants from terminating her employment and denying her privileges as a neurosurgeon at BMC. (*See* Def. Ex. C).

On May 14, 2008, Dr. Soni's motion for a temporary restraining order was denied. (Def. Ex. D). In denying her motion, the state court judge found that there was substantial doubt as to the likelihood of success on the merits of Dr. Soni's claims in light of a provision in the Physician Practice Agreement allowing either party to terminate the agreement upon sixty days notice "for any reason," and because "there appear to be plausible issues as to the quality of the plaintiff's performance of her professional responsibilities." (*Id.*). Additionally, the state court judge determined that Dr. Soni had not demonstrated that she would be irreparably harmed given the availability of money damages and the prospect of alternative employment, and that a balancing of the equities favored the BMC Defendants. (*Id.*).

Thereafter, Dr. Soni dismissed her state court complaint voluntarily, and filed counterclaims against the BMC Defendants in the State Court Action. (*See* Def. Ex. F). As amended, Dr. Soni's counterclaims include, among others, claims that the BMC

---

1. The defendants' exhibits are attached to their memorandum filed in support of their motion to dismiss (Docket No. 23). Because the exhibits consist of public records that have been filed in state court, this court may consider them without converting the defen-

dants' motion into one for summary judgment. *See Alternative Energy, Inc.*, 267 F.3d at 33 (on a motion to dismiss, court may consider "official public records" without converting motion into one for summary judgment).

Defendants retaliated against her based on her complaints of discrimination against Dr. Day, and claims that the BMC Defendants wrongfully terminated her employment in retaliation for her complaints about patient safety issues. (*See id.* at Counts I–III & IX–XI). In addition, Dr. Soni is seeking injunctive relief in the form of an order rescinding her termination and reinstating her employment. (*Id.* at Count XXI).

Additional factual details relevant to this court's analysis are described below.

## III. ANALYSIS

### A. *Motion to Dismiss Standard of Review*

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the non-moving party. *Cooperman,* 171 F.3d at 46. Dismissal is only appropriate if the pleadings, so viewed, fail to support a "plausible entitlement to relief." *Rodriguez–Ortiz v. Margo Caribe,* 490 F.3d 92, 95 (1st Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 559, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. *Maldonado v. Fontanes,* 568 F.3d 263, 268 (1st Cir.2009). " 'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.' " *Id.* (quoting *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)) (internal citations omitted). "Second, only a complaint that states a plausible claim for relief" will survive a motion for judgment on the pleadings. *Id.* (quoting *Ashcroft,* 129 S.Ct. at 1950). "This second principle recognizes that the court's assessment of the pleadings is 'context specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.' '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting *Ashcroft,* 129 S.Ct. at 1950) (internal citations omitted; alterations in original). As detailed below, this court finds that when the applicable standard is applied to the pleadings in this case, dismissal is warranted with respect to all of the claims against Dr. Chin, BMC Corp. and BUNA, the FCA and Title VII claims against Dr. Day, the claim for conspiracy, and the claim against BUSM for intentional infliction of emotional distress.

### B. *Abstention Under the Colorado River Doctrine*

The defendants contend, as a threshold matter, that this court should abstain from exercising jurisdiction over this action and dismiss Dr. Soni's claims pursuant to the abstention-like doctrine established by the Supreme Court in *Colorado River.* That doctrine "permits federal courts to decline jurisdiction in favor of parallel state litigation for reasons of 'wise judicial administration.' " *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 915 F.2d 7, 8 (1st Cir.1990) (quoting *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246). However, "[t]here must be some extraordinary circumstances for a federal court to shrink from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *KPS & Assocs., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 10 (1 st Cir.2003) (quotations and citations

omitted). In the instant case, the defendants have not established the presence of extraordinary circumstances that would support dismissal under the *Colorado River* doctrine.

■■ "Generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction[.]" *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246 (quotations and citation omitted). Moreover, due to the federal courts' obligation to exercise the jurisdiction given them, "the surrender of jurisdiction in favor of parallel state proceedings for reasons of 'wise judicial administration' is permissible only in 'exceptional' circumstances." *Villa Marina Yacht Sales, Inc.*, 915 F.2d at 12 (quoting *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1246). Accordingly, "while the general principle is to avoid duplicative litigation, the pendency of an overlapping state court suit is an insufficient basis in and of itself to warrant dismissal of a federal suit" and "[o]nly the clearest of justifications will warrant dismissal[.]" *Id.* (quotations, citations and alteration omitted).

■■ "[C]ourts look to a variety of factors to determine whether 'exceptional circumstances' exist which counsel the abdication of jurisdiction in favor of parallel state court litigation." *KPS & Assocs., Inc.*, 318 F.3d at 10. These factors include:

(1) whether either court has assumed jurisdiction over a *res;* (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) re-

spect for principles underlying removal jurisdiction.

*Id.* "This list is by no means exhaustive, nor is any one factor necessarily determinative." *Id.* Furthermore, in evaluating these factors, the court must always keep in mind "the 'heavy presumption favoring the exercise of jurisdiction[.]'" *Id.* (quoting *Villa Marina Yacht Sales, Inc.*, 915 F.2d at 13).

The parties agree that the first two factors—whether either court has assumed jurisdiction over a res and the inconvenience of the federal forum—are neutral and therefore do not weigh in favor of abstention. Additionally, neither party contends that the last factor, concerning respect for the principles underlying removal jurisdiction, is implicated in this case. After carefully considering the remaining factors in light of the obligation to exercise jurisdiction, this court finds that abstention is not appropriate.

### *Avoidance of Piecemeal Litigation*

■ The defendants argue that the desirability of avoiding piecemeal litigation weighs in favor of abstention. In particular, they contend that in the absence of abstention, they would be forced to pay for duplicative discovery and for the costs of having their attorneys argue similar issues in two different forums. They also contend that the existence of parallel actions could lead to conflicting interlocutory orders, which would result in further costs and waste judicial resources. (Def. Mem. at 17–18). However, "[d]uplication and inefficiency are not enough to support a federal court's decision to bow out of a case over which it has jurisdiction." *Villa Marina Yacht Sales, Inc.*, 915 F.2d at 13. Furthermore, "[d]ismissal is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues." *KPS &*

*Assocs., Inc.*, 318 F.3d at 10 (internal quotations omitted). Where a case "fails to raise concerns emanating from piecemeal litigation *more* harmful or *more* unfair than the generalized risks of waste and prejudgment conflicts, the third factor fails to meet the threshold that would counsel abstention." *Guzzi v. Thompson*, 470 F.Supp.2d 17, 22–23 (D.Mass.2007).[2]

The defendants further argue that "piecemeal litigation of complex civil rights controversies is strongly disfavored." (Def. Mem. at 18). However, the civil rights issues raised by this case are not complex, and more importantly, do not "implicate broad policy considerations." *KPS & Assocs., Inc.*, 318 F.3d at 11. *Compare Colorado River*, 424 U.S. at 819–20, 96 S.Ct. at 1247 (dismissal appropriate where clear federal policy encouraged avoidance of piecemeal adjudication of water rights in a river system). Rather, this case concerns an employment dispute that "is of primary importance only to the immediate parties." *KPS & Assocs., Inc.*, 318 F.3d at 11. Under such circumstances, dismissal is not appropriate. *See id.* (concerns about piecemeal litigation did not support dismissal or stay of action having primary importance only to parties to the lawsuit).

### Order of Filing

▮ The defendants also contend that dismissal is appropriate under the fourth factor because the State Court Action has progressed much farther than the federal action. As the defendants recognize, "the fourth factor relating to the order of the lawsuits 'should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.' " *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 21, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983)).

While this court agrees that the greater progress in the State Court Action favors abstention, this factor does not weigh heavily against the presumption in favor of maintaining jurisdiction.

Dr. Soni filed the present lawsuit on December 8, 2008. (*See* Compl.). Discovery remains stayed pending the outcome of the defendants' motion to dismiss. (*See* Docket Entry dated 3/24/09). The State Court Action has been ongoing since May 7, 2008. Nevertheless, it is undisputed that the state court proceedings were delayed during the summer of 2008, that discovery remains ongoing, and that the matter has not reached summary judgment. (*See* Def. Mem. at 19; Pl. Mem. at 19). Furthermore, there is nothing in the record before this court to suggest that the State Court Action will reach final disposition anytime soon. Therefore, while this court finds that consideration of the fourth factor supports abstention, "its weight is not overwhelming." *Guzzi*, 470 F.Supp.2d at 23 (declining to give significant weight to fourth factor where state proceedings had not progressed "starkly" beyond the federal action).

### Controlling Law

▮ The fifth factor, whether federal or state law controls, "will favor abstention only if state law predominates and provides the rule of decision." *Id.* Most of Dr. Soni's claims in this case arise under federal law, and "the presence of a federal law issue 'must always be a major consideration weighing against surrender [of jurisdiction.]' " *Villa Marina Yacht Sales, Inc.*, 915 F.2d at 15 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 26, 103 S.Ct. at 942). Moreover, her state law claims, which consist of claims for conspiracy and intentional infliction of emotional distress, are straightforward and do not

---

**2.** As discussed in court, it is assumed that at least some of the discovery taken in the state court proceeding will be used in the federal action and will not need to be duplicated.

involve complex questions of state law. "[T]he presence of state law issues weighs in favor of dismissal in only rare circumstances—namely, when a case presents complex questions of state law that would best be resolved by a state court." *KPS & Assocs., Inc.*, 318 F.3d at 11 (quotations and citations omitted). Therefore, consideration of the fifth factor counsels against abstention.

### Adequacy of the State Forum

This court also finds that the sixth factor weighs in favor of maintaining jurisdiction. The defendants argue that the state court would adequately protect the plaintiff's rights because it shares concurrent jurisdiction with the federal court over all of the plaintiff's claims. (Def. Mem. at 19–20). While it may be true that the state court has jurisdiction to resolve all of Dr. Soni's claims,[3] the parties in the two proceedings are not identical, and the defendants have not shown how the plaintiff would be able to obtain complete relief in the State Court Action.

■■■■ "[Dismissal] under *Colorado River* is appropriate only where the parties may obtain complete relief in the state court proceedings[.]" *Currie v. Group Ins. Comm'n*, 290 F.3d 1, 12 (1st Cir.2002). Thus,

> [w]hen a[ ] court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all.

*Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28, 103 S.Ct. at 943). Two of the defendants here, BUSM and Dr. Day, are not parties to the State Court Action, and it is far from clear that, at this juncture, they could be joined as parties in that case. Accordingly, this court finds that there is substantial doubt as to whether the plaintiff could obtain complete relief in state court.

### Nature of the Federal Claims

Finally, the defendants argue that Dr. Soni's claims should be dismissed because her present lawsuit is nothing more than forum shopping, and because her "scattershot and virtually interminable filings," as well as certain of her factual allegations such as those involving Dr. Chin's relationship with a neurosurgery fellow, suggest vexatiousness. (Def. Mem. at 20). Although Dr. Soni's multiple lawsuits may constitute an inefficient and haphazard litigation strategy, there is insufficient evidence in the record to compel the conclusion that her present action is contrived or vexatious.

■■■ As the defendants point out, before Dr. Soni filed the instant case in federal court, the state court rejected her efforts to obtain a temporary restraining order to prevent the termination of her employment at BMC. "[I]f [the plaintiff] went to federal court solely in reaction to [her] failure in the [state] court, that fact should be held against [her] in the *Colorado River* balance." *Villa Marina Yacht Sales, Inc.*, 915 F.2d at 15. However, the record does not demonstrate that this was Dr. Soni's motivation for invoking federal court jurisdiction. Significantly, Dr. Soni did not file her federal complaint until December 8, 2008, nearly seven months after her motion for a temporary restraining order was denied. (*See* Def. Ex. D). Furthermore, Dr. Soni's claims in this ac-

---

**3.** As described below, this court rejects the plaintiff's argument that this court has exclu-sive jurisdiction over the plaintiff's FCA claims.

tion, in contrast to the claims she has asserted in state court, are overwhelmingly federal in nature, and there is nothing in the record to warrant a conclusion that Dr. Soni's decision to proceed in federal court was based solely on the state court's decision to deny her motion rather than a desire to have her federal claims adjudicated in a federal forum.

While this court agrees that Dr. Soni's decision to pursue discrimination and retaliation claims in different jurisdictions and in multiple lawsuits may be inefficient and burdensome, there is no evidence that the present action demonstrates vexatiousness. As an initial matter, "the pendency of an overlapping state court suit is an insufficient basis in and of itself to warrant dismissal of a federal suit." *Villa Marina Yacht Sales, Inc.,* 915 F.2d at 12. Furthermore, the defendants have not established vexatiousness based on Dr. Soni's factual allegations. In particular, Dr. Soni's allegations regarding Dr. Chin's relationship with a neurology fellow, and his resulting effort not to "make waves" with hospital management, support her claim that Dr. Chin had the motivation to retaliate against her for complaining about alleged regulatory violations and improper billing practices at BMC. Thus, the record does not show that Dr. Soni is merely attempting to "embarrass the Defendants in a public forum[.]" (Def. Mem. at 20). Accordingly, this court concludes that the final factor, concerning the vexatious or contrived nature of the federal claims, does not support abstention.

### Consideration of Factors in Combination

When the relevant factors are considered in their totality, in light of the heavy presumption in favor of exercising jurisdiction, this court declines to abstain. The only factor that weighs in favor of abstention is the factor concerning the order of filing. However, in light of the fact that this factor does not weigh overwhelmingly in favor of abstention, and that this case does not otherwise present "exceptional circumstances" supporting the abdication of jurisdiction, this court declines to dismiss the plaintiffs' claims under the *Colorado River* doctrine.

### C. Compliance with Fed.R.Civ.P. 8(a)

The defendants have moved to dismiss all of Dr. Soni's claims on the grounds that her complaint fails to comply with Fed. R.Civ.P. 8(a). Rule 8(a) provides in relevant part that "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a)(2). The defendants contend that dismissal is warranted because the "[p]laintiff's 355–paragraph complaint, impermissibly overstuffed with superfluous, pointless, and at times, vexatious allegations, fails to comply with the 'short and plain statement' dictates of [the Rule.]" (Def. Mem. at 22). They further assert that the allegations are so lengthy that it is impossible for the defendants to provide a meaningful answer. (*Id.* at 23).

The purpose of the notice pleading requirements set forth in Fed. R.Civ.P. 8(a) is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quotations and citation omitted). "While a court may dismiss a pleading that does not comply with the notice pleading requirements of Rule 8, the exercise of this power is generally reserved for a pleading that is 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " *Black v. UNUMProvident Corp.,* 245 F.Supp.2d 194, 197 (D.Me.2003) (quoting *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995)).

This court agrees that the allegations of the complaint are needlessly lengthy and repetitive. Nevertheless, the complaint "sets forth sufficient facts to inform [the defendants] of the allegations against [them] and is not so unintelligible as to prevent a response." *Id.* Therefore, the motion to dismiss the complaint pursuant to Rule 8(a) is denied.

■ As an alternative to complete dismissal under Rule 8(a), the defendants have moved to strike numerous paragraphs of the complaint pursuant to Fed. R.Civ.P. 12(f), which authorizes the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "In resolving motions to strike, trial courts are empowered with broad discretion." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 398 (D.R.I.1998). However, such motions are disfavored by the courts. *Id. See also Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir.1985) (motions to strike under Fed.R.Civ.P. 12(f) "are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion"). Furthermore, while the defendants assert generally that the complaint contains impertinent and scandalous material, they have made no attempt to explain why the challenged allegations fit within those descriptions.[4] Therefore, this court declines to strike them.

Although this court will not dismiss or strike portions of the complaint under Rules 8(a) or 12(f), this court does find that the complaint is overly detailed and repetitive, and that it contains allegations that are unrelated to Dr. Soni's claims against the named defendants.[5] Additionally, this court's dismissal of certain claims and defendants is likely to render many of Dr. Soni's factual allegations irrelevant and confusing. Therefore, within thirty (30) days of the date of this Memorandum and Order, Dr. Soni shall file an amended complaint setting forth her surviving claims against the remaining defendants and containing only those factual allegations that are directly relevant to those claims.

### D. *Failure to Assert Compulsory Counterclaims*

■ The defendants also have moved to dismiss all of the plaintiff's claims on the grounds that they should have been brought as compulsory counterclaims in the State Court Action. This court agrees that Dr. Soni's claims against the BMC Defendants, Dr. Chin, BMC Corp. and BUNA, should have been asserted in state court pursuant to Mass. R. Civ. P. 13(a), and therefore must be dismissed under the compulsory counterclaim rule.[6] However, because Dr. Day and BUSM are not parties to the State Court

---

4. The only allegations that the defendants attack specifically are the allegations pertaining to Dr. Chin's alleged relationship with a neurology fellow. As this court has noted above, it is clear from the complaint that those facts relate to Dr. Chin's alleged motivation for silencing Dr. Soni's complaints about inadequacies at BMC. Therefore, this court will not strike them.

5. For example but without limitation, the complaint identifies a number of individuals who were employed by one or more of the defendants, and alleges generally that they participated in discriminatory and retaliatory

conduct perpetrated against Dr. Soni. (*See* Compl. ¶¶ 24–31). However, none of those individuals has been named as a defendant in this matter, and the complaint contains no facts describing their participation in any wrongdoing or how their actions are relevant to Dr. Soni's claims against the named defendants.

6. "Federal Courts will not permit an action to be maintained where the claims asserted should have been brought as a compulsory counterclaim in an earlier action. Where the earlier action is a state court action, that state's law determines whether the new claim

Action, the rule does not apply to Dr. Soni's claims against those defendants.

Mass. R. Civ. P. 13(a) provides in relevant part:

A pleading shall state as a counterclaim any claim for relief ... which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not either require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction or constitute an action required by law to be brought in a county or judicial district ... other than the county or judicial district in which the court is sitting.

"Failure to raise a compulsory counterclaim typically bars assertion of the claim in a subsequent action." *Nat'l Lumber Co. v. Canton Inst. for Sav.*, 56 Mass.App.Ct. 186, 187, 775 N.E.2d 1241, 1242 (2002).

Dr. Soni argues that she was not obligated to bring her claims as compulsory counterclaims in the State Court Action because that case involves a contractual dispute. (*See* Pl. Mem. at 22). This court disagrees. "For purposes of determining whether a counterclaim is compulsory ... the word 'transaction' should not be construed narrowly or technically, but should be construed in a sense to effectuate the settlement in one proceeding of controversies *so closely connected* as appropriately to be combined in one trial in order to prevent duplication of testimony, to avoid unnecessary expense to the parties and to the public, and to expedite the adjudication of suits." *Nat'l Lumber Co.*, 56 Mass.App. Ct. at 188, 775 N.E.2d at 1242–43 (quota-

tions and citations omitted; emphasis in original).

The fundamental question raised by the BMC Defendants in the State Court Action is whether the decision to terminate Dr. Soni's employment was appropriate. Although Dr. Soni's claims in this action are not based on contract law and involve different remedies than a contract dispute, the essential question raised by her claims is the same—whether the decision to terminate Dr. Soni's employment was proper. Moreover, all of her claims in this action arise out of the same occurrences that gave rise to the State Court Action, namely, the circumstances surrounding the decision to end her employment. Therefore, this court concludes that under Mass. R. Civ. P. 13(a), Dr. Soni's claims arise out of the transaction or occurrence that is the subject of the BMC Defendants' claims in the State Court Action.

Rule 13(a) applies only to claims that arise out of a transaction or occurrence that is the subject of the "opposing party's" claim. *See* Mass. R. Civ. P. 13(a). Neither BUSM nor Dr. Day is a party to the State Court Action. Therefore, while the compulsory counterclaim rule supports dismissal of the claims against the BMC Defendants, it does not support dismissal of Dr. Soni's claims against BUSM or Dr. Day. *See McMenimen v. Pietropaolo*, Civil Action No. 05–12229–GAO, 2006 WL 1240483, at *1–2 (D.Mass. May 4, 2006) (denying motion to dismiss claims for failure to raise them as compulsory counterclaims in state court proceedings where defendants could not be considered "opposing parties" within the meaning of Mass. R. Civ. P. 13(a)).[7]

should have been brought as a compulsory counterclaim." *Procare Labs., Inc. v. Gull Labs., Inc.*, 50 F.3d 15, 1995 WL 110137, at *1 (9th Cir. Mar. 15, 1995) (unpub. op.) (citations omitted)

7. In a footnote, the defendants argue that to the extent the court dismisses the claims against the BMC Defendants, it should also dismiss Dr. Soni's claims against Dr. Day and BUSM because the BMC Defendants are necessary parties under Fed.R.Civ.P. 19(a), and

■ Dr. Soni argues that the compulsory counterclaim rule cannot defeat her claims under the FCA because the federal district courts have exclusive jurisdiction over those claims. (Pl. Mem. at 21–22). However, neither the language of the statute nor the cases that have addressed the issue support the plaintiff's assertion that jurisdiction lies exclusively with the federal courts.

■ The FCA "protects employees who investigate and supply information concerning fraudulent practices of their employers to appropriate internal personnel or the government[.]" *Tighe v. Career Sys. Dev. Corp.*, 915 F.Supp. 476, 485 (D.Mass.1996). It provides in relevant part:

> (1) **In general.**—Any employee ... shall be entitled to all relief necessary to make that employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... on behalf of the employee ... or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.
>
> (2) **Relief.**—Relief under paragraph (1) shall include reinstatement with the same seniority status that employee ... would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. *An action under this subsection may be brought in the appropriate district court of the United*

> *States for the relief provided in this subsection.*

31 U.S.C. § 3730(h) (emphasis added). Thus, the statute specifies that actions such as the present one, arising out of alleged retaliation for protected activity under the FCA, "may" be brought in federal court. However, there is nothing in the statutory language to suggest that such jurisdiction shall be exclusive.

Section 3732(a) of the statute, which pertains to venue, does not compel a different conclusion. That provision reads:

> Any action under section 3730 *may* be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

31 U.S.C. § 3732(a) (emphasis added). Therefore, the plain language of the statute pertaining to jurisdiction is permissive rather than mandatory.

The only courts that appear to have addressed the issue have concluded that state courts have concurrent jurisdiction over civil actions brought under the FCA. *See United States ex rel. Paul v. Parsons, Brinkerhoff, Quade & Douglas, Inc.*, 860 F.Supp. 370, 374–75 (S.D.Tex.1994) (finding that "pursuant to the language of the [FCA], there is concurrent jurisdiction between the federal and state courts"), *aff'd*, 53 F.3d 1282 (5th Cir.1995); *United States ex rel. Hartigan v. Palumbo Bros., Inc.*, 797 F.Supp. 624, 631–32 (N.D.Ill.1992)

the case may not proceed without them. (*See* Def. Mem. at 21 n. 6). "[A]rguments raised only in a footnote or in a perfunctory manner are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n. 17 (1st Cir.1999).

Moreover, it is not readily apparent to this court that they are necessary parties. Therefore, this court will not address this issue further.

(concluding that state courts may entertain causes of action under the FCA). In *Hartigan*, the court noted that "exclusive federal jurisdiction over cases arising under federal law has been the exception rather than the rule. Thus, there is a deeply rooted presumption in favor of concurrent jurisdiction[.]" *Hartigan*, 797 F.Supp. at 631 (internal citation omitted). The court acknowledged, however, that the presumption in favor of concurrent jurisdiction can be overcome "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests." *Id.* After considering the language of the FCA and the legislative history, and evaluating whether state court jurisdiction had been divested by "a clear incompatibility between state court jurisdiction and federal interests[,]" the court concluded that federal court jurisdiction over claims arising under the FCA was not exclusive. *See id.* at 631–32.

The *Paul* court, in reaching the same conclusion, emphasized that the Supreme Court has recognized "that it has 'consistently held that state courts have inherent authority and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.'" *Paul*, 860 F.Supp. at 374 (quoting *Tafflin v. Levitt*, 493 U.S. 455, 460, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990)). The *Paul* court further noted that

> State courts are courts of general jurisdiction. When a federal statute intends that claims arising under it be litigated in a specific jurisdiction, the statute will explicitly state that suit may be brought 'only' in federal court, or that the jurisdiction mentioned by the statute shall be "exclusive." If exclusive jurisdiction is neither express nor implied by the statute, state courts will have concurrent jurisdiction.

*Id.* at 374–75 (citations omitted). The court concluded that because "[t]he False Claims Act states that an action arising under it 'may' be brought in federal court ... there is concurrent jurisdiction between the federal and state courts." *Id.* at 375.

The cases cited by the plaintiff, *Giles v. United States*, 233 Fed.Appx. 987 (Fed. Cir.2007) (unpub. op.), and *LeBlanc v. United States*, 50 F.3d 1025 (Fed.Cir. 1995), do not support an alternative conclusion. In both those cases, the courts determined that the federal district courts, and not the Court of Federal Claims, had jurisdiction over claims arising under the FCA. *See Giles*, 233 Fed.Appx. at 989–90; *LeBlanc*, 50 F.3d at 1030–31. However, the issue before the courts in those cases was whether the Court of Federal Claims could exercise subject matter jurisdiction over claims arising under the FCA. Neither of those cases addressed the question whether state courts have concurrent jurisdiction over such claims.

Based on the plain language of the statute and the relevant case law, this court concludes that state courts have concurrent jurisdiction over Dr. Soni's FCA claims. Therefore, this court will allow the motion to dismiss all of the claims against the BMC Defendants, but not the claims against BUSM and Dr. Day, pursuant to the compulsory counterclaim rule.

### E. Claims for Retaliation Under the False Claims Act

 In Claim 1 of her Complaint, Dr. Soni asserts claims against the defendants, pursuant to 31 U.S.C. § 3730(h), for unlawful retaliation based on conduct protected by the FCA. "To prevail on a False Claims Act retaliation claim, a plaintiff must show that 1) the employee's conduct was protected under the [Act]; 2) the employer knew that the employee was en-

gaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir.2004), *cert. denied*, 543 U.S. 820, 125 S.Ct. 59, 160 L.Ed.2d 28 (2004). The defendants contend that Dr. Soni's allegations are insufficient to satisfy any of these elements. (Def. Mem. at 9–13). Since the claims against BMC Corp., BUNA and Dr. Chin have been dismissed as discussed above, this court will read this count as being directed only to BUSM and Dr. Day. However, there is no question that Dr. Day did not supervise or otherwise employ Dr. Soni and this claim will be dismissed as to him.[8] However, this court finds that the plaintiff has alleged enough of a factual predicate to support a claim against BUSM as her employer.[9]

### Allegations of Protected Conduct

"In order to satisfy the first element of a cause of action under 31 U.S.C. § 3730(h), a plaintiff must demonstrate that he or she engaged in activity protected under the FCA." *Karvelas*, 360 F.3d at 236. This does not mean that the plaintiff must have filed a lawsuit under the FCA or "developed a winning claim at the time of the alleged retaliation. Rather, an employee's conduct is protected where it involves 'acts done . . . in furtherance of' an FCA action." *Id.* (quoting 31

U.S.C. § 3730(h)). The First Circuit has interpreted " 'conduct in furtherance of an action under the FCA' as conduct that reasonably could lead to a viable FCA action." *Id.*

"Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation," and "a defendant violates the FCA only when he or she has presented to the government a false or fraudulent claim, defined as any request or demand . . . for money or property where the government provides or will reimburse any part of the money or property requested." *Id.* at 225 (quotations and citations omitted). Consequently, for purposes of a retaliation claim under § 3730(h), conduct that " 'reasonably could lead' to an FCA action" includes "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Id.* at 237. "[A]n employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is not enough to constitute protected activity under the statute. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir.1998).

Dr. Soni alleges that during her employment at BMC,[10] she investigated numerous areas of non-compliance with governmental regulations concerning con-

---

**8.** In addition, Dr. Soni does not allege that Dr. Day did anything to promote her termination on the basis of her protected conduct, *i.e.*, her investigations at BMC. Therefore, there is no basis for a claim against Dr. Day under the False Claims Act.

**9.** It is unclear from the complaint whether Dr. Soni was employed by BUSM. However, since the defendants have claimed that BSUM was her employer and entitled to the protection of the Workers' Compensation Act, this court will assume that BUSM was Dr. Soni's employer.

**10.** Although Dr. Soni's allegations in support of her FCA claims concern conduct that occurred at BMC, she alleges that BMC is the primary teaching hospital for BUSM. Moreover, the defendants have not argued that Dr. Soni's allegations concerning BMC cannot also be attributed to BUSM due to the nature of the relationship between those entities. Therefore, at this juncture, this court will assume that the allegations regarding BMC are equally applicable to BUSM.

ditions for participation in the Medicare and Medicaid programs. In particular, she alleges that she investigated whether BMC was in violation of federal regulatory standards regarding hospital governance, patient rights, quality assessment, medical staffing, nursing services, infection control, surgical services, and emergency services. (*See* Compl. ¶¶ 127–28, 137–38, 150–51, 154–55, 160–61, 170–71, 193–94). She also alleges that she made numerous complaints about the hospital's potential regulatory violations. (*See id.* ¶¶ 152, 156, 162, 172, 195). "Although '[c]orrecting regulatory problems may be a laudable goal,' it is 'not actionable under the FCA in the absence of actual fraudulent conduct.'" *Karvelas,* 360 F.3d at 237 (quoting *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir.1996)). Dr. Soni has not alleged any facts linking the potential regulatory violations to any kind of fraud on the government.[11] Therefore, they do not give rise to a claim under the FCA.

On the other hand, investigations and reports of fraudulent billing practices are actionable under the FCA. *See id.* at 237–38 (allegations that hospital improperly billed Medicare and Medicaid could support plaintiff's FCA retaliation claim). There is no dispute that the Complaint contains allegations indicating that Dr. Soni complained about fraudulent Medicare billing practices at BMC. (*See* Def. Mem. at 11). Nevertheless, the defendants contend that those allegations are too vague and conclusory to satisfy the notice pleading requirements of Fed. R.Civ.P. 8(a). This court finds that although the allegations of fraudulent billing practices lack detail, they are sufficient to

"give the defendant[s] fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. at 998 (quotations and citation omitted). Dr. Soni alleges that in his efforts to maximize revenues for the BMC Neurology Department, Dr. Chin submitted fraudulent claims to third-party payers. (Compl. ¶ 144). The plaintiff intends to disclose the specific facts relating to these claims, and the identity of those to whom she complained, only upon authorization from the court. (*See id.* ¶ 145). Nevertheless, in her complaint, Dr. Soni alleges the Department of Neurology engaged in billing for unnecessary medical items and treatment, and that under the direction of Dr. Chin, BMC submitted excessive bills to third-party payers for routine surgical procedures. (*Id.* ¶¶ 173, 189–90). According to Dr. Soni, a large percentage of the patients treated at BMC were beneficiaries of Medicare, Medicaid and other federal health care programs. (*Id.* ¶ 134). Thus, Dr. Soni's allegations support an inference that the defendants improperly billed the government for unnecessary or excessive medical procedures.

Dr. Soni also alleges that she repeatedly complained, both to Dr. Chin and to other supervisors, regarding alleged improper billings within the Department of Neurology. (*See, e.g., id.* ¶¶ 173, 206, 212, 260). Therefore, this court concludes that the plaintiff has adequately alleged that she engaged in conduct that reasonably could lead to an FCA action.

### Employer's Knowledge

This court also finds that Dr. Soni has alleged enough facts to satisfy the

---

11. In her opposition to the motion to dismiss, Dr. Soni suggests that her allegations regarding her investigation of possible regulatory violations support a claim under the FCA because BMC submitted false statements to the government certifying its compliance with those regulations. (*See* Pl. Mem. at 11–12). However, there are no facts in the Complaint indicating that any of the defendants submitted false certifications to any government entity in connection with any claims.

remaining elements of her FCA claim. "To meet the knowledge element of an FCA retaliation claim, the whistleblower must show the employer had knowledge the employee engaged in protected activity. In other words, the employer must be on notice that the employee is engaged in conduct that reasonably could lead to a False Claims Act case." *Karvelas*, 360 F.3d at 238 (quotations and citation omitted). However, "the employer need not know that the employee has filed or plans to file a qui tam action, nor even necessarily be aware of the existence of the FCA." *Id.* Rather, "[w]hat the employer must know is that the plaintiff is engaged in protected conduct, that is, investigation or other activity concerning false of [sic] fraudulent claims that the employer knowingly presented to the federal government." *Id.* at 239.

As described above, Dr. Soni's allegations support an inference that the defendants submitted excessive or otherwise improper claims to the government and that Dr. Soni notified hospital supervisors of this conduct. Thus, the facts set forth in the complaint are adequate to support a conclusion that the plaintiff provided notice of protected conduct under the FCA. *See Karvelas*, 360 F.3d at 239 (allegations that plaintiff notified employers concerning false claims for payment that hospital knowingly submitted to the government satisfied knowledge element of FCA).

### Reason for Retaliatory Conduct

Finally, "in order to state a claim for retaliation, [the plaintiff] must also allege that [s]he was terminated *because* of [her] protected conduct." *Id.* In the instant case, the defendants argue that the plaintiff has alleged nothing more than conclusory allegations that parrot the language of the statute. (Def. Mem. at 12–13). "Simply parroting the language of a statutory cause of action, without providing some factual support, is not sufficient to state a claim." *Karvelas*, 360 F.3d at 240. However, this court finds that Dr. Soni has alleged enough facts to support an inference that she was terminated because of her complaints, including her complaints about allegedly fraudulent billing activity.

Dr. Soni alleges that she was notified of her termination on March 3, 2008, within a couple of months after she began to intensify her complaints about issues at the hospital to Dr. Chin and others at BMC. (Compl.¶¶ 132, 233). She also alleges that Dr. Chin sought to terminate her employment "in retaliation for raising concerns regarding quality assurance issues, medical billing matters, and Medicare/Medicaid program compliance." (*Id.* ¶ 240). The medical billing matters allegedly included "fraudulent billings ... which relate to Medicare/Medicaid program compliance." (*Id.* ¶ 232).

According to Dr. Soni, Dr. Chin was motivated to silence her complaints about problems at BMC. In particular, she alleges that due to a blemished start in the Neurosurgery Department at BMC, Dr. Chin "sought to not 'make waves' with the hospital management" and to "maximize revenues for the hospital." (*Id.* ¶¶ 115, 117). She also alleges that it was Dr. Chin's efforts to maximize revenues for the Neurosurgery Department that lead him to submit fraudulent claims to third-party payers. (*Id.* ¶ 144). When taken as true and viewed in combination with the allegations regarding Dr. Soni's repeated complaints, these facts support an inference that Dr. Chin was acting with a retaliatory motive in seeking to terminate Dr. Soni's employment.

Dr. Soni also claims that the stated reason for her termination—her failure to timely complete medical records and billing forms—was pretextual. (*Id.* ¶ 244). As an initial matter, she alleges that her

failure to meet these obligations was caused by BMC's refusal to provide her with a minimal level of administrative assistance. (*Id.* ¶ 247). She also alleges that the Massachusetts Medical Board prohibits disciplinary actions against physicians for administrative tasks such as the failure to timely complete medical records, and that BMC's medical staff by-laws provide only for administrative suspension due to untimely recordkeeping. (*Id.* ¶¶ 250–51). According to the plaintiff, the real reason the defendants terminated her was because she had "rais[ed] quality assurance issues, medical billing matters, and Medicare/Medicaid program compliance issues to hospital personnel." (*Id.* ¶ 244). These facts are sufficient to allege that Dr. Soni was terminated because of her complaints, including her complaints about fraudulent billing activity.

The complaint may be short on detail regarding the factual basis for Dr. Soni's FCA claims. However, when the facts that have been alleged are viewed in Dr. Soni's favor, this court finds that they are sufficient to support a claim under the FCA.

### F. *Claims for Violations of Title VII*

 In Claims IV and V of her complaint, Dr. Soni has asserted claims against the defendants for employment discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* The defendants have moved to dismiss these claims only as against the individual defendants, Drs. Day and Chin, on the grounds that individual liability is not available under Title VII. As detailed above, the claim against Dr. Chin should have been asserted as a compulsory counterclaim in the State Court Action. Moreover, even if Title VII provided for individual liability, Dr. Day could not be held liable under the statute because he was not acting as an agent of any of Dr. Soni's employers at the time of the events giving rise to this ac-

tion. In any event, the defendants are correct that under the law of this Circuit, only employers, and not individuals, may be liable under Title VII. *See Fantini v. Salem State Coll.*, 557 F.3d 22, 30–31 (1st Cir.2009) (finding that no individual liability is available under Title VII). Therefore, Dr. Soni's claim under Title VII shall be dismissed against all defendants except BUSM.

### G. *Claim for Conspiracy*

Dr. Soni claims, in Claim VI of her complaint, that the defendants acted in concert and conspired to discriminate and retaliate against her, to deprive her of her civil rights and to violate her rights under the FCA. The defendants argue that dismissal of Claim VI is warranted because the plaintiff has not alleged any facts to support a civil conspiracy claim. In particular, they argue that Dr. Soni "has not alleged any facts indicating that the Defendants combined for the purpose of committing a tort or that the defendants knew of a common goal or purpose." (Def. Mem. at 14–15). This court agrees. Therefore, Dr. Soni's claims for conspiracy will be dismissed.

The plaintiff argues that her conspiracy claim is not based only on common law, but falls under 42 U.S.C. § 1985 as well. She also argues that her factual allegations support both types of conspiracy claims. The complaint makes no reference to 42 U.S.C. § 1985. Moreover, even assuming Dr. Soni brought her conspiracy claim under both state law and § 1985, she has failed to allege any facts showing that the defendants acted in concert to discriminate or retaliate against her or otherwise deprive her of her rights.

#### Conspiracy Claims Under 42 U.S.C. § 1985

 42 U.S.C. § 1985 "confers a private right of action for injuries occa-

sioned when 'two or more person ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws....' " *Burns v. State Police Assoc. of Mass.*, 230 F.3d 8, 12 n. 3 (1st Cir.2000) (quoting 42 U.S.C. § 1985(3)). "To state a claim under § 1985(3), a plaintiff must, among other requirements, allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* at 12 (quotations, citation and footnotes omitted). A "conspiracy" is "an agreement by the defendant with another person or persons" to commit an unlawful offense. *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir.1993). Accordingly, to state a claim under 42 U.S.C. § 1985, the plaintiff must allege facts showing the existence of any agreement between two or more persons. Such an agreement need not be explicit, but may "be inferred from other evidence including a course of conduct." *Id.* at 1300.

### Common Law Conspiracy

 "Under Massachusetts law, either of two possible causes of action may be called 'civil conspiracy.' " *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994). The first is a "coercive type" of civil conspiracy, which requires the plaintiff to establish "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." *Id.* (quoting *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985)). The "second type of civil conspiracy," which is at issue in this case, "is more akin to a theory of common law joint liability in tort[,]" and it "is invoked to support liability of one person for a tort committed by another." *Id.* at 1564. "For

liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Id.* "As the [Massachusetts] Appeals Court observed, '[k]ey to this [latter] cause of action is a defendant's substantial assistance [to another], with the knowledge that such assistance is contributing to a common tortious plan.' " *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 228 (D.Mass.1999) (quoting *Kurker v. Hill*, 44 Mass.App.Ct. 184, 189, 689 N.E.2d 833, 837 (1998)), *aff'd* 229 F.3d 1133 (1st Cir.2000). Therefore, to support a claim for common law conspiracy, the plaintiff must allege facts showing the existence of an agreement or common plan between two or more persons.

### Dr. Soni's Allegations

 In the instant case, the plaintiff argues that she has alleged the existence of a conspiracy between Dr. Day and Dr. Chin to terminate her employment. (Pl. Mem. at 14–15). However, this court finds that Dr. Soni has not alleged sufficient facts to support an inference that these defendants had an agreement or engaged in a common plan to remove her from her position.

Dr. Soni claims that Dr. Day sought to retaliate against her for filing a discrimination claim against him and for supporting other female neurosurgeons in connection with their complaints against him. (Compl. ¶¶ 228–29). She also claims that Dr. Chin notified her of her termination within one week after she returned to BMC from a meeting in New Orleans at which she had seen Dr. Day for the first time since she had graduated from her residency program at Brigham & Womens. (*See* Compl. ¶¶ 225–227, 233). According to Dr. Soni,

Dr. Chin communicated with Dr. Day or others within the neurosurgery community immediately prior to notifying her of her termination. (*Id.* ¶ 230). However, she does not allege any facts regarding the substance of any such communication and whether it concerned Dr. Soni. Nor does she allege that Dr. Day said anything or did anything to encourage Dr. Chin to end her employment. Although the plaintiff alleges that Dr. Chin terminated her in order to obtain Dr. Day's approval for a neurosurgery residency training program (*see id.* ¶ 231), there simply is nothing in the complaint to indicate that Dr. Chin was acting in concert with Dr. Day rather than on his own initiative in order to please Dr. Day. Therefore, the motion to dismiss Dr. Soni's conspiracy claim is allowed.

### H. Claim for Intentional Infliction of Emotional Distress

 The defendants have moved to dismiss Dr. Soni's claim against BMC Corp., BUNA, BUSM and Dr. Chin for intentional infliction of emotional distress on the grounds that such claims are within the exclusivity provision of the Workers' Compensation Act.[12] "Common law actions are barred by the exclusivity provision of the workers' compensation act where: 'the plaintiff is shown to be an employee; his condition is shown to be a personal injury within the meaning of the [workers'] compensation act; and the injury is shown to have arisen out of and in the course of ... employment.' " *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 558, 664 N.E.2d 808, 813 (1996) (quoting *Foley v. Polaroid Corp.*, 381 Mass. 545, 548–49, 413 N.E.2d 711, 713–14 (1980)) (additional quotations and citation omitted). Claims against an employer for intentional infliction of emotional distress meet this test. *Id.* See also

*Brown v. Nutter, McClennen & Fish*, 45 Mass.App.Ct. 212, 214–15, 696 N.E.2d 953, 955 (1998) (affirming dismissal of employee's claim against employer for intentional infliction of emotional distress based on exclusivity clause of Workers' Compensation Act). Therefore, in addition to the fact that, if viable, this claim should have been brought against BMC, BUNA and Dr. Chin in the State Court Action, Dr. Soni cannot maintain a claim against the remaining defendant-employer, BUSM, for intentional infliction of emotional distress. Therefore, Claim VII of the complaint is dismissed except to the extent that it seeks relief against Dr. Day.

### IV. CONCLUSION

For all the reasons set forth above, the "Defendants' Consolidated Motion to Dismiss or, in the Alternative, to Strike" (Docket No. 22) is ALLOWED IN PART and DENIED IN PART. Specifically, the motion is allowed as to (1) all claims against Dr. Chin, BMC Corp. and BUNA; (2) Dr. Soni's claims against Dr. Day under the FCA and Title VII; (3) the claims for conspiracy; and (4) Dr. Soni's claim for intentional infliction of emotional distress against all defendants except Dr. Day. The motion is otherwise denied. Within thirty (30) days following the date of this Memorandum of Decision and Order, Dr. Soni shall file an amended complaint that sets forth her surviving claims against BUSM and Dr. Day, and contains only those factual allegations that are directly relevant to those claims.

---

**12.** The defendants have not moved to dismiss Dr. Soni's claim for intentional infliction of emotional distress against Dr. Day.